## UNITED STATES ex rel. EICHENLAUB v. SHAUGHNESSY, ACTING DISTRICT DIRECTOR OF IMMIGRATION AND NATURALIZATION.

NO. 3.

Argued November 16–17, 1949.—Decided January 16, 1950.

*George G. Shiya* argued the cause and filed a brief for petitioner in No. 3.

*Eugene H. Nickerson* argued the cause and filed a brief for petitioner in No. 82.

*Harold D. Cohen* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Campbell* and *Robert S. Erdahl.*

MR. JUSTICE BURTON delivered the opinion of the Court.

These cases present the question of whether § 1 of the Act of May 10, 1920,[1] authorizes the deportation of an alien under the following circumstances occurring since that Act took effect:

---

[1] 41 Stat. 593, see 8 U. S. C. § 157.

(1) The alien was naturalized; (2) while he was a naturalized citizen he was convicted of a conspiracy to violate the Espionage Act of 1917;[2] (3) thereafter, in a denaturalization proceeding, his citizenship was revoked and his certificate of naturalization canceled on the ground that he had procured it by fraud; and (4) the proper authority, after the required hearings, found the alien to be an undesirable resident of the United States and ordered him deported. For the reasons hereinafter stated, we hold that the Act authorizes such deportation.

## No. 3—THE EICHENLAUB CASE.

Richard Eichenlaub, the relator, was born in Germany in 1905, and entered the United States from there in 1930. He was naturalized as an American citizen in 1936, and has resided in the United States continuously since his reentry in 1937, when he returned from a visit to Germany. In 1941, on his plea of guilty in the United States District Court for the Eastern District of New York, he was convicted of conspiring to act as an agent for a foreign government without having been registered with the Secretary of State.[3] He was sentenced to imprisonment for 18 months and fined $1,000. In 1944, with his consent, a judgment was entered in the United States District Court for the Southern District of New York canceling his citizenship on the ground of fraud

---

[2] Act of June 15, 1917, 40 Stat. 217.

[3] This was under § 37 of the general conspiracy statute, 35 Stat. 1096, 18 U. S. C. (1946 ed.) § 88, now 18 U. S. C. § 371; and under § 3 of Title VIII of the Espionage Act of 1917, 40 Stat. 226, 22 U. S. C. § 233, as amended by § 6 of the Act of March 28, 1940, 54 Stat. 80, 22 U. S. C. (1946 ed.) § 601, now 18 U. S. C. § 951. Several other defendants stood trial in this proceeding, and were convicted both on this and on a general espionage count. Their conviction was affirmed on this count, but reversed on the other. *United States* v. *Heine,* 151 F. 2d 813 (C. A. 2d Cir.).

in its procurement.[4]   Deportation proceedings were then instituted against him [5] and, after a hearing before an Immigration Inspector and a review by the Board of Immigration Appeals, the Attorney General, in 1945, ordered his deportation.[6]

This proceeding for a writ of *habeas corpus* was then filed in the court last named.   After hearing, the writ was dismissed and the dismissal was affirmed by the United States Court of Appeals for the Second Circuit. 167 F. 2d 659.   We denied certiorari.   335 U. S. 867. However, when the Court of Appeals affirmed the *Willumeit* case, now before us, on the authority of this case, but called attention to the added impression which had been made upon it by the argument in favor of Willumeit on the point above stated, we vacated our denial of certiorari in this case and granted certiorari in both.   337 U. S. 955.

### No. 82—THE WILLUMEIT CASE.

In 1905, Otto A. Willumeit, the relator, was born in Lorraine, which at that time was a part of Germany,

---

[4] Under § 338 of the Nationality Act of 1940, 54 Stat. 1158–1160, 8 U. S. C. § 738.

[5] Under § 1 of the Act of May 10, 1920, 41 Stat. 593–594, 8 U. S. C. § 157.

[6] Under the 1940 Reorganization Plan No. V, 54 Stat. 1238, the functions and powers of the Secretary of Labor under the Act of May 10, 1920, were transferred to the Attorney General.   The warrant of deportation recited that the relator had been "found to be a member of the undesirable classes of alien residents enumerated . . ." in the Act of May 10, 1920.   While the administrative file is not in the printed record, it was used in argument in the Court of Appeals and is on file here.   The Board of Immigration Appeals at page 5 of its opinion found as a fact that the "respondent is an undesirable resident of the United States."   The Court of Appeals, at 167 F. 2d 660, properly recognized this additional matter in the record as justifying its acceptance of the less specific finding recited in the warrant of deportation, and as distinguishing this case from *Mahler* v. *Eby*, 264 U. S. 32, 42–46, on that point.

but at the time of his arrest for deportation had become a part of France. He entered the United States from there in 1925. In 1931 he was naturalized, and he has resided in the United States continuously since his reentry in 1941 after a visit to Mexico. In 1942, on his plea of guilty in the United States District Court for the District of Connecticut, he was convicted of having conspired to violate that portion of the Espionage Act of 1917 which made it a crime to transmit to an agent of a foreign country information relating to the national defense of this country, with intent or reason to believe that such information would be used to the injury of the United States or to the advantage of a foreign nation.[7] He was sentenced to imprisonment for five years. In 1944, with his consent, a judgment was entered in the United States District Court for the Northern District of Illinois canceling his citizenship on the ground of fraud in its procurement.[8] Deportation proceedings were then instituted against him and, after a hearing before an Immigration Inspector and a review by the Board of Immigration Appeals, the Attorney General, in 1947, ordered his deportation.[9]

---

[7] This conviction was under §§ 2 and 4 of Title I of the Act of June 15, 1917, 40 Stat. 218–219, 50 U. S. C. (1946 ed.) §§ 32 and 34, now 18 U. S. C. §§ 794 and 2388.

[8] See note 4, *supra*. In this record the final decree of denaturalization is set forth in full. Among other things, it states that the order admitting the relator to citizenship—

"is hereby vacated, annulled and set aside, and that the certificate of citizenship, . . . is hereby cancelled and declared null and void, . . . and the defendant Otto Albert Willumeit is hereby forever restrained and enjoined from setting up or claiming any rights or privileges, benefits or advantages whatsoever under said order, . . . or the certificate of citizenship issued by virtue of said order."

[9] The order was based not only upon § 1 of the Act of May 10, 1920, 41 Stat. 593–594, 8 U. S. C. § 157, the applicability of which in turn was based upon the relator's conviction of a violation of the Espionage Act of 1917, but also upon §§ 13 and 14 of the Immigra-

This proceeding for a writ of *habeas corpus* was filed in the United States District Court for the Southern District of New York and, after a hearing, the writ was dismissed. The United States Court of Appeals for the Second Circuit affirmed the dismissal on the authority of its decision in the *Eichenlaub* case.[10]  171 F. 2d 773.

---

tion Act of 1924, 43 Stat. 161–162, as affected by 46 Stat. 581, 50 Stat. 165, the 1940 Reorganization Plan No. V, 54 Stat. 1238, and 60 Stat. 975, 8 U. S. C. §§ 213 and 214, having to do with relator's reentry into the United States from Mexico in 1941. The Court of Appeals found it unnecessary to pass on this alleged ground for deportation in view of its conclusion as to the other ground. 171 F. 2d at 775. We concur for the same reason.

As in the *Eichenlaub* case, the warrant of deportation apparently stated that it was based on the fact that the relator "has been found to be a member of the undesirable classes of alien residents . . . ." While the warrant is not printed in the record, the findings of the Commissioner of Immigration and of the Board of Immigration Appeals are printed in full. Each contains an express finding that the relator "is an undesirable resident of the United States." Each states reasons for so concluding.

[10] The return to the writ of *habeas corpus* in this case states that, in addition to issuing the above-described warrant of deportation, the Attorney General ordered the relator interned in 1945 as a dangerous alien enemy and, in 1946, ordered the relator removed from this country for that reason. That proceeding derives its authority from the Alien Enemy Act of July 6, 1798, 1 Stat. 577, as it appears in R. S. § 4067, as affected by 40 Stat. 531, and Presidential Proclamation No. 2655 of July 14, 1945, 3 C. F. R. 1945 Supp. 29; 59 Stat., Pt. 2, 870, see 50 U. S. C. § 21. It thus raises questions as to the "enemy" status of an alien born in Lorraine, which at the time of his birth was a part of Germany, but at the time of his arrest was a part of France. While the Government refers to this Act in its argument in interpreting the Act of May 10, 1920, as *in pari materia*, it does not press this arrest as a separate ground for dismissal of the writ of *habeas corpus*. See *United States ex rel. Zeller* v. *Watkins,* 167 F. 2d 279 (C. A. 2d Cir.) ; *United States ex rel. Gregoire* v. *Watkins,* 164 F. 2d 137 (C. A. 2d Cir.) ; *United States ex rel. D'Esquiva* v. *Uhl,* 137 F. 2d 903 (C. A. 2d Cir.) ; *United*

Because of the importance of the issue to American citizenship, we granted certiorari. 337 U. S. 955.

The proper scope of the Act of 1920 as applied to these cases is found in the ordinary meaning of its words. The material provisions of the Act are as follows:

". . . That aliens of the following classes . . . shall, upon the warrant of the [Attorney General], be taken into his custody and deported . . . if the [Attorney General],[11] after hearing, finds that such aliens are undesirable residents of the United States, to wit:

.        .        .        .        .

"(2) All aliens who since August 1, 1914, have been or may hereafter be convicted of any violation or conspiracy to violate any of the following Acts or parts of Acts, the judgment on such conviction having become final, namely:

"(a) [The Espionage Act of 1917, as amended]."[12]

---

*States ex rel. Umecker* v. *McCoy,* 54 F. Supp. 679 (N. D.). The court below did not find it necessary to pass on this issue (171 F. 2d at 775), nor do we.

[11] See note 6, *supra.*

[12] The first paragraphs of the Act of May 10, 1920, are, in full, as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That aliens of the following classes, in addition to those for whose expulsion from the United States provision is made in the existing law, shall, upon the warrant of the Secretary of Labor, be taken into his custody and deported in the manner provided in sections 19 and 20 of the Act of February 5, 1917, entitled 'An Act to regulate the immigration of aliens to, and the residence of aliens in, the United States,' if the Secretary of Labor, after hearing, finds that such aliens are undesirable residents of the United States, to wit:

"(1) All aliens who are now interned under section 4067 of the Revised Statutes of the United States and the proclamations issued by the President in pursuance of said section under date of April 6,

The above words require that all persons to be deported under this Act shall be "aliens." [13] They do not limit its scope to aliens who never have been naturalized. They do not exempt those who have secured certificates of naturalization, but then have lost them by court order on the ground of fraud in their procurement. They do not suggest that such persons are not as clearly "aliens" as they were before their fraudulent naturalization. [14]

1917, November 16, 1917, December 11, 1917, and April 19, 1918, respectively.

"(2) All aliens who since August 1, 1914, have been or may hereafter be convicted of any violation or conspiracy to violate any of the following Acts or parts of Acts, the judgment on such conviction having become final, namely:

"(a) An Act entitled 'An Act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes,' approved June 15, 1917, or the amendment thereof approved May 16, 1918; . . . ." 41 Stat. 593–594, see 8 U. S. C. § 157.

The subsequent subdivisions (2) (b) to (h), inclusive, refer to the Explosives Act, 40 Stat. 385; Act Restricting Foreign Travel, 40 Stat. 559; Act Punishing Injury to War Material, 40 Stat. 533; Army Emergency Increase Act, 40 Stat. 80, 884, 955; Act Punishing Threats Against the President, 39 Stat. 919; Trading with the Enemy Act, 40 Stat. 411; and the Seditious Conspiracy Section of the Penal Code, 35 Stat. 1088.

[13] The word "alien" is not defined in the Act. It is, however, defined in closely related statutes. The Immigration Act of February 5, 1917, provides: "the word 'alien' wherever used in this Act shall include any person not a native-born or naturalized citizen of the United States; . . . ." 39 Stat. 874, see 8 U. S. C. § 173. The Immigration Act of May 26, 1924, provides: "The term 'alien' includes any individual not a native-born or naturalized citizen of the United States, . . . ." 43 Stat. 168, see 8 U. S. C. § 224. These definitions are in effect today. In Title 8 of the United States Code they are included in and are made to apply to the entire chapter on Immigration and that chapter includes as § 157 the Act of May 10, 1920.

[14] While the Act also makes no express distinction between its applicability to aliens who never have been naturalized and to those

There is no question as to the power of Congress to enact a statute to deport aliens because of past misconduct.[15] That is what Congress did in the Act of 1920, and there is no occasion to restrict its language so as to narrow its plain meaning.

The one substantial issue is whether the Act requires that the relators not only must have been "aliens" at the times when they were ordered deported, but that they must also have had that status at the times when they were convicted of designated offenses against the national security. The Government suggests that one route to a conclusion on this issue is to hold that the relators, as a matter of law, were "aliens" when so convicted. The basis it suggests for so holding is that the judicial annulment of the relators' naturalizations on the ground of fraud in their procurement deprived them of their naturalizations *ab initio. Rosenberg* v. *United States,* 60 F. 2d 475 (C. A. 3d Cir.). They thus would be returned to their status as aliens as of the date of their respective naturalizations. Accordingly, they would come within the scope of the Act of 1920, even if that Act were held to require that all offenders subject to deportation under it also must have had an *alien status when convicted* of the designated offenses.

In our opinion, it is not necessary, for the purposes of these cases, to give a retroactive effect to the denatu-

---

who have been naturalized, but have lost their naturalized citizenship by lawful and voluntary expatriation (see 8 U. S. C. §§ 800–810), the possibility of such a distinction is not before us in the instant cases. The required finding by the Attorney General, after hearing, that any alien who is to be deported is an undesirable resident of the United States prevents the automatic deportation of anyone under this Act without such a hearing and finding.

[15] *Mahler* v. *Eby,* 264 U. S. 32; *Ng Fung Ho* v. *White,* 259 U. S. 276, 280; *Bugajewitz* v. *Adams,* 228 U. S. 585; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 730.

ralization orders. A simpler and equally complete solution lies in the view that the Act does not require that the offenders reached by it must have had the status of aliens at the time they were convicted. As the Act does not state that necessity, it is applicable to all such offenders, including those denaturalized before or after their convictions as well as those who never have been naturalized. The convictions of the relators for designated offenses are important conditions precedent to their being found to be undesirable residents. Their status as aliens is a necessary further condition of their deportability. When both conditions are met and, after hearing, the Attorney General finds them to be undesirable residents of the United States, the Act is satisfied.

The statutory language which says that "aliens who since August 1, 1914, *have been or may hereafter be convicted* . . ." (emphasis supplied)[16] refers to the requirement that the deportations be applicable to all persons who had been convicted of certain enumerated offenses since about the beginning of World War I (August 1, 1914), whether those convictions were had before or after May 10, 1920. The crimes listed were not crimes in which convictions depended upon the citizenship, or lack of citizenship, of their perpetrators. In fact, they were crimes against the national security, so that their commission by naturalized citizens might well be regarded by Congress as more reprehensible than their commission by aliens who never had been naturalized.

The recognized purpose of the Act was deportation. It is difficult to imagine a reason which would have made it natural or appropriate for Congress to authorize the Attorney General to pass upon the undesirability and deportability of an alien, never naturalized, who had been convicted of espionage, but would prohibit the Attorney

---

[16] See note 12, *supra*.

General from passing upon the undesirability and deportability of aliens, such as the relators in the instant cases, who had procured certificates of naturalization before their convictions of espionage, but later had been deprived of those certificates on the ground of fraud in their procurement. If there were to be a distinction made in favor of any aliens because they were at one time naturalized citizens, the logical time at which that status would be important would be the time of the *commission* of the crimes, rather than the purely fortuitous time of their *conviction* of those crimes. Not even such a distinction finds support in the statute.

The failure of Congress to give expression to the distinction, here urged by the relators, between aliens who never have been naturalized and those who have been denaturalized, was not due to unfamiliarity with such matters. In 1920, Congress must have been familiar with the status of aliens denaturalized under § 15 of the Act of June 29, 1906, 34 Stat. 601, see 8 U. S. C. § 736,[17] or expatriated under § 2 of the Citizenship Act of March 2, 1907, 34 Stat. 1228, see 8 U. S. C. § 801. It had had experience with the deportation of undesirable aliens under § 19 of the Immigration Act of February 5, 1917, 39 Stat. 889, see 8 U. S. C. § 155, as well as under other wartime Acts and Proclamations. These Acts did not distinguish between aliens who never had been naturalized, and those who had obtained naturalization by

---

[17] "The practice of filing proceedings to cancel certificates of naturalization became widespread immediately after The 1906 Act went into effect. In the fiscal year 1907 there were eighty-six certificates cancelled; in 1908 there were four hundred and fifty-seven; and in 1909, nine hundred and twenty-one. During the thirty years following the effective date of the 1906 Act, more than twelve thousand certificates of naturalization were cancelled on the ground of fraud or on the ground that the order and certificate of naturalization were illegally procured." Cable, Loss of Citizenship 4–5 (1943).

fraud only to lose it by court decree. If the Act of 1920 had been intended to initiate the distinction here urged by the relators, it is likely that the change would have been made by express provision for it. We find nothing in its legislative history that suggests a congressional intent to distinguish between two such groups of undesirable criminals.

The Congressional Committee Reports demonstrate that, while this statute was framed in general language and has remained in effect for 30 years, its enactment originally was occasioned by a desire to deport some or all of about 500 aliens who were then interned as dangerous enemy aliens and who might be found, after hearings, to be undesirable residents, and also to deport some or all of about 150 other aliens who, during World War I, had been convicted of violations of the Espionage Act or other national security measures, and who might be found, after hearings, to be undesirable residents.[18] It is hardly conceivable that, under those circumstances, Congress, without expressly saying so, intended to prevent the Secretary of Labor (or his successor, the Attorney General) from deporting alien offenders merely because they had received their respective convictions at times when they held certificates of naturalization, later canceled for fraud. To do so would permit the denaturalized aliens to set up a canceled fraudulent status as a defense, and successfully to claim benefits and advantages under it.[19] Congress, in 1920, evidently wanted to provide a means by which to free the United States of residents who (1) had been or thereafter were convicted of certain offenses against the security of the United

[18] See H. R. Rep. No. 143 and S. Rep. No. 283, 66th Cong., 1st Sess.; 58 Cong. Rec. 3362–3376 (1919); *Ludecke* v. *Watkins,* 335 U. S. 160, 167–168, n. 12, 179–181.

[19] Compare the injunction included in the final decree of denaturalization quoted in note 8, *supra.*

States, (2) had been or thereafter were found, after hearing, to be undesirable residents of the United States, and (3) being aliens were subject to deportation. Congress said just that.

We have given consideration to such other points as were raised by the relators, but we find that they do not affect the result.[20]

The judgment of the Court of Appeals in each case is therefore

*Affirmed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BLACK and MR. JUSTICE JACKSON join, dissenting.

In light of the attitude with which the doom of deportation has heretofore been viewed by this Court, in the case of those whose lives have been intimately tied to 'this country, I deem it my duty not to squeeze the Act of May 10, 1920, 41 Stat. 593, as amended, 8 U. S. C. § 157, so as to yield every possible hardship of which its words are susceptible. See *Ng Fung Ho* v. *White,* 259 U. S. 276, 284–85; *Delgadillo* v. *Carmichael,* 332 U. S. 388, 391; *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, 10; *Bridges* v. *Wixon,* 326 U. S. 135, 147; *Fiswick* v. *United States,* 329 U. S. 211, 222, n. 8; *Klapprott* v. *United States,* 335 U. S. 601, 612, modified, 336 U. S. 942. Because we have been mindful of the fact that such deportation may result "in loss of both property and life; or of all that makes life worth living," this Court concluded

---

[20] Among these is the claim in the *Eichenlaub* case that the Act of 1920 does not apply to his conviction under the Espionage Act of 1917, because, in substance, the penalty for its violation had been increased in 1940. This contention is without merit.

that due process of law requires judicial determination when a claim of citizenship is made in a deportation proceeding, while upon entry or reentry the same claim may be determined administratively. It took into account the great difference "in security of judicial over administrative action." *Ng Fung Ho* v. *White, supra,* at 284, 285. I am aware of the fact that we are dealing here with a person whose citizenship has been taken from him. I maintain, however, that the rigorous statute permitting deportation of an "alien" should be read to apply only to one who was an alien when convicted and should not be made to apply to persons in the position of these petitioners.

Since such construction is not unreasonable, due regard for consequences demands that the statute be so read. Where, as here, a statute permits either of two constructions without violence to language, the construction which leads to hardship should be rejected in favor of the permissible construction consonant with humane considerations. The Act of May 10, 1920, provides that "All aliens who since August 1, 1914, have been or may hereafter be convicted" of certain offenses shall be deported upon a finding that they are "undesirable residents of the United States." Since neither of the petitioners herein was found to "have been" convicted of any offense before passage of the Act, they come, it is urged, within the alternative prerequisite. But the statute, in terms, refers to aliens "who . . . may hereafter be convicted," not persons who are citizens when convicted and later transformed into aliens by the process of denaturalization. And this view of the statute is reinforced by the legislative history as well as by considerations relating to the impact of the Court's decision upon various other congressional enactments not now before us.

The Committee reports[1] and congressional debate[2] make plain that Congress was principally concerned with the status of about 500 persons who had been interned by the President during the First World War as dangerous alien enemies and about 150 aliens who had been convicted under various so-called war statutes. Congress could not have been unaware that naturalized citizens may lose their citizenship; yet nowhere in the legislative history do we find the remotest hint that Congress had also such denaturalized citizens in mind. On the contrary, the debates contain ample evidence that Congress had in mind only persons convicted when aliens.[3]

The Court's decision has serious implications with respect to citizens denaturalized for reasons not involving moral blame,[4] and who have, while citizens, committed one of a variety of acts not involving moral obliquity and

---

[1] H. R. Rep. No. 143, 66th Cong., 1st Sess. (1919); S. Rep. No. 283, 66th Cong., 1st Sess. (1919).

[2] 58 Cong. Rec. 3361–3377.

[3] Representative Gard: "I assume that everybody will agree with that, that if an alien is tried, is afforded a fair trial and is convicted, then he is a proper subject for deportation." 58 Cong. Rec. 3371.

Representative Robsion, discussing wealthy aliens: "We permitted them to live here and granted them practically all of the rights of the American citizen. They reward our hospitality by joining with our enemies in an effort to destroy us. As they were not citizens, they were not required to take up arms in defense of the country in which they had grown rich." 58 Cong. Rec. 3374.

[4] Citizenship is lost by any person "Voting in a political election in a foreign state." 8 U. S. C. § 801 (e). Bills are now before Congress to restore citizenship to the approximately 4,000 Americans who voted in recent Italian elections. See H. R. 6616 and 6617, 81st Cong., 2d Sess. (1950); H. R. Rep. No. 1469, 81st Cong., 2d Sess. (1950); 96 Cong. Rec. App. 117 (January 9, 1950). See also 8 U. S. C. §§ 801 (c) and (d), 804; *Battaglino* v. *Marshall,* 172 F. 2d 979. As to denaturalization based on fraud in the procurement of citizenship, see *Baumgartner* v. *United States,* 322 U. S. 665.

certainly not endangering the security of the country but which nevertheless are covered by other statutory provisions in language similar to that before us.[5]  Thus, discriminations would as a matter of policy have to be drawn if this general problem were consciously faced by policy-makers.  They are not within the power of this Court to draw.  If and when Congress gives the matter

---

[5] *E. g.*, 8 U. S. C. § 156a provides for the deportation of any alien, with exceptions not here pertinent, "who, after February 18, 1931, shall be convicted for violation of or conspiracy to violate" any federal or State narcotics law.  In *United States* v. *Balint*, 258 U. S. 250, this Court held that conviction under the federal Anti-Narcotic Act can be had without the usual requirement of *scienter*.

Even convictions under laws related to the national security involve varying degrees of culpability.  This is demonstrated by the remarks of the prosecuting attorney to the District Court concerning Dr. Willumeit, the relator in No. 82, when his sentence was being considered:

"It has been our belief, after having gone into this thing pretty thoroughly with him [the relator], that he was more or less caught in it without perhaps intending to go as far as the others went.

.     .     .     .     .

". . . I have a feeling, your Honor, that Dr. Willumeit can be restored to decent citizenship in this country.  I think he has something that he can give to America.

.     .     .     .     .

". . . I would say that the Government would view a lenient sentence as a just sentence under all the circumstances.  We think something can be done with this man.  We do not think he is a bad man at heart, your Honor.  We think he is probably a good man who got in with bad company and got in with this trouble.

.     .     .     .     .

"I say to your Honor I am not his lawyer.  I am supposed to be hard with him, I guess, if I believe in it.  But in this case I do not feel that this man is a bad actor.  I think there is a place for Dr. Willumeit in America in time, and he may become a most useful citizen."

.

thought, it may well draw distinctions between one who was an alien and one who was naturalized at the time of conviction, based on the manner in which citizenship was lost, the type of offense committed, and the lapse of time between conviction and denaturalization. These serious differentiations should not be disregarded by giving a ruthlessly undiscriminating construction to the statute before us not required by what Congress has written.