216 F.2d 33
 UNITED STATES of America ex rel. Nickolas Diani CIRCELLA, Petitioner-Appellant,
v.
Walter A. SAHLI, District Director of Immigration and Naturalization, U. S. Department of Justice, Chicago, Illinois, Respondent-Appellee.
 No. 11044.
 United States Court of Appeals Seventh Circuit.
 October 12, 1954.
 Rehearing Denied November 16, 1954.
 
 COPYRIGHT MATERIAL OMITTED Thomas M. Tracey, Chicago, Ill., for appellant.
 Robert Tieken, U. S. Atty., John Peter Lulinski, Anna R. Lavin, Asst. U. S. Attys., John M. McWhorter, District Counsel, Immigration and Naturalization Service, Chicago, Ill., for appellee.
 Before MAJOR, LINDLEY and SWAIM, Circuit Judges.
 SWAIM, Circuit Judge.
 
 
 1
 The relator, Nickolas Diani Circella, filed in the United States District Court for the Northern District of Illinois a petition for a writ of habeas corpus alleging that his detention by Marcus T. Neelly, the District Director of Immigration and Naturalization, United States Department of Justice, was illegal and in violation of relator's constitutional rights.
 
 
 2
 The relator was taken into custody by the respondent on a warrant for relator's arrest which charged that he was subject to deportation under the 1917 Immigration Act, 8 U.S.C.A. (1940 Edition) § 155(a), because he had been convicted prior to his entry into the United States of assault with intent to murder, an offense involving moral turpitude. At the conclusion of the hearing on this first charge the Service lodged an additional charge that relator was also subject to deportation under the Immigration and Nationality Act of 1952, 8 U.S. C.A. § 1251 et seq., because he had been convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct, which crimes were committed after his entry into the United States in 1902. The second crime was conspiracy to interfere with trade and commerce by violence, threats and coercion in violation of the Anti-Racketeering Act, former Title 18 U.S.C.A. § 420a,[1] repealed in 1948.
 
 
 3
 In the hearing conducted before a special inquiry officer concerning the deportation, evidence was offered by the Service to show that the relator was born in Italy, August 24, 1898; that he first entered the United States on January 26, 1902; that he had never been naturalized; that his first conviction of a crime was on September 14, 1916, in the Criminal Court of Cook County, Illinois, which was an assault with intent to murder; and that on his conviction of this crime relator was sentenced to the Illinois State Reformatory at Pontiac for an indeterminate number of years. On February 2, 1929, the relator made a trip by plane from Miami, Florida, to Bimini in the Bahamas, returning to Florida on the same day. It was also shown that on April 7, 1942, relator was convicted of the crime of conspiracy to interfere with trade and commerce by violence, threats and coercion in violation of 18 U.S.C.A. § 420a.
 
 
 4
 On April 14, 1953, the special inquiry officer who conducted the hearing entered an order that the relator be deported on the original charge and on the lodged charge. The relator's appeal from this order was, on August 3, 1953, dismissed by the Board of Immigration Appeals.
 
 
 5
 On September 10, 1953, Marcus T. Neelly, the respondent, issued a warrant of deportation against the relator. Shortly thereafter counsel for the relator notified the respondent that there would be a petition for a writ of habeas corpus filed on behalf of the relator and was informed by the respondent that such a petition might be filed at the time the relator was arrested. On September 14 the relator and his attorney, pursuant to an arrangement made with Mr. Cushman, an officer of the Immigration Service, went to the office of the Immigration and Naturalization Service for a conference with Mr. Cushman concerning the relator's bond. In a telephone conversation Mr. Cushman had informed the relator's attorney that it was not the purpose of the Service to arrest the relator for immediate deportation. However, on their arrival at the Service office the relator was immediately placed under arrest and he and his attorney were informed that the relator was to be immediately deported to Italy. At that time counsel for the relator informed Mr. Neelly that he intended to immediately petition the United States District Court for the Northern District of Illinois for a writ of habeas corpus and served on Mr. Neelly a typewritten notice to that effect. Without paying any regard to the notice that a petition for a writ of habeas corpus was to be filed the respondent caused the relator to be handcuffed, removed from the building and placed in an automobile to be transported to Hammond, Indiana. After the relator had been taken from the building his attorney proceeded to the United States District Court and at 12:05 P. M. filed the petition for a writ of habeas corpus. Shortly thereafter, at 12:08 P. M., the relator was returned by automobile to the building where the Service maintained its offices in order that relator's custodians might pick up certain necessary papers relating to his deportation. The relator was then taken to Hammond, Indiana, out of the jurisdiction of the United States District Court for the Northern District of Illinois. At Hammond, Indiana, the relator was placed in a detention cell to await a train to New York. That same afternoon at 2:05 P. M. a writ of habeas corpus was issued by Judge Barnes of the United States District Court for the Northern District of Illinois commanding the respondent to produce the body of the relator before that court on September 21, 1953. That evening about five o'clock the relator was placed on a New York Central train which originated in Chicago, taken to New York City, New York, and detained at Ellis Island in the Southern District of New York.
 
 
 6
 On September 15, 1953, a petition for a writ of habeas corpus was filed on behalf of the relator in the United States District Court for the Southern District of New York. The petition in that court was denied after a very brief hearing.
 
 
 7
 On September 21, 1953, the respondent filed his return to the writ of habeas corpus, stating that at the time the writ was issued the respondent did not have custody of relator but that relator was then in the custody of the Immigration Service in New York.
 
 
 8
 On September 28, 1953, relator's case was again called before the United States District Court for the Northern District of Illinois and at that time the United States Attorney asked leave to withdraw the return which had been filed by his office challenging the jurisdiction of the court. This leave was granted and the United States Attorney was thereupon ordered to file a return meeting the petition on its merits, which he did. To this the relator filed a traverse and thereafter a hearing, at which the relator was present, was held before Judge Campbell of that court. Judge Campbell rendered a memorandum opinion, and entered findings of fact and conclusions of law and an order dismissing the writ of habeas corpus. United States ex rel. Circella v. Neelly, 115 F.Supp. 615. From this order the relator prosecutes this appeal.
 
 
 9
 On this appeal the relator states that the United States District Court for the Northern District of Illinois had jurisdiction to issue the writ of habeas corpus on September 14, 1953, and the United States Attorney agrees that the jurisdiction of that court is not in question. Of course, the parties cannot bestow jurisdiction by agreement, Ahrens v. Clark, 335 U.S. 188, 193, 68 S.Ct. 1443, 92 L.Ed. 1898, but we also agree that the court, under the facts of this case, had jurisdiction. At the time the petition for habeas corpus was filed the relator, Circella, in charge of two subordinates of the respondent, Neelly, was still in the territorial jurisdiction of the United States District Court for the Northern District of Illinois. His subsequent removal by the respondent to Indiana did not rob the Illinois court of jurisdiction. Ex parte Mitsuye Endo, 323 U.S. 283, 305, 65 S.Ct. 208, 89 L.Ed. 243.
 
 
 10
 It is true, as counsel for the relator states, that the 1917 Immigration Act was expressly repealed by the Immigration and Nationality Act of 1952, but it is also true that the provisions of the 1917 Act here involved were saved by Section 405 of the 1952 Act. 8 U.S.C.A. (Copyright 1953) § 1101 note.
 
 
 11
 The relator next attacks the conclusion of the special inquiry officer that the relator was subject to deportation because, prior to his entry into the United States, he had been convicted of assault with intent to murder. The relator attacks this conclusion because it is based on the finding that the relator "entered" the United States by plane at Miami, Florida, on February 2, 1929. The evidence to support this finding was, first, the testimony of the pilot who flew the plane from Miami to Bimini and back on February 2, 1929. The pilot testified that on that trip he transported Circella and three other passengers. The witness identified the relator in the courtroom as the Circella who made that trip. The Government manifests of the trip also showed that a man by the same name as the relator and who was born on the same day as the relator was one of the passengers on the trip. Although Circella was present in the courtroom during the taking of the testimony concerning the trip he did not deny that he was the Circella who was one of the passengers on that trip.
 
 
 12
 The Supreme Court has defined entry as used in the 1917 Act as including "any coming of an alien from a foreign country into the United States whether such coming be the first or any subsequent one." United States ex rel. Volpe v. Smith, 289 U.S. 422, 425, 53 S.Ct. 665, 667, 77 L.Ed. 1298. In the instant case, as in the Volpe case, the alien departed from the United States, went to the foreign land and returned to the United States, knowingly and voluntarily. The 1952 Act has adopted this definition by expressly defining entry as meaning "any coming of an alien into the United States from a foreign port or place or from an outlying possession". 8 U.S.C.A. § 1101(a) (13).
 
 
 13
 The relator also complains of the admission into evidence of Exhibits 8, 13, 14 and 15 by the special inquiry officer in the hearing to determine whether the relator was subject to deportation. Exhibit 8 was the relator's official registration as an alien, a document signed and sworn to by the relator December 11, 1940. It showed that he was born in and was still a citizen of Italy, and that he had been convicted of a crime and sentenced to imprisonment in the Illinois State Reformatory at Pontiac, Illinois, for from one to fourteen years. Exhibit 8 also included an application for certificate of identification sworn to and signed by relator on February 17, 1942. Exhibit 13 was relator's signed petition for naturalization filed with the Immigration and Naturalization Service on June 15, 1940. Exhibit 14 was a statement by relator for purposes of naturalization signed and sworn to before two naturalization examiners on April 1, 1941, admitting that he was sentenced to from one to fourteen years in the Pontiac Reformatory for "robbery" on September 21, 1916. Exhibit 15 was an affidavit of relator as petitioner for naturalization, stating that he thought his father had been naturalized and that relator acquired citizenship through him, but that at his father's death he found no naturalization certificate and inquiry disclosed no record of his father's naturalization.
 
 
 14
 The only reason given for the nonadmissibility of these exhibits is that relator was not warned at the time the documents were signed and sworn to by him that they might later be used against him in a deportation proceeding. As authority he cites Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, in which the Supreme Court held that the Immigration Service must abide by its own rules in deportation cases. The Court there further held that certain exhibits were improperly admitted because they didn't comply with Rule 150.1(c) of the Regulations of the Immigration and Naturalization Service, 8 C.F.R. (1941 Supp.) 150.1(c).
 
 
 15
 The 1952 revision of Title 8 C.F.R. contains no § 150.1 but all of that section's requirements are now incorporated in § 242.11(c) which reads as follows:
 
 
 16
 "Whenever, in the course of an investigation, information is obtained which indicates that the person investigated is subject to arrest and deportation, and it is desired to use such information as evidence in support of an application for a warrant of arrest, such information shall be reduced to writing either in narrative or question-and-answer form and signed by the person furnishing the information. Whenever such recorded statement is to be obtained from any person, the investigating officer shall * * * (2) warn the person that any statement made by him may be used as evidence against him * * *." (Emphasis added.)
 
 
 17
 Relator cites this section in his brief and claims that it is controlling in his situation. We do not agree with him. The rule is addressed to investigating officers "in the course of an investigation" to uncover information that would justify a warrant of arrest. The documents here in question were made many years prior to this deportation proceeding or any investigation leading to it. There is nothing on the face of this rule that would affect the admission of documents made and sworn to by the deportee years before any investigation as to his deportability. This situation is covered by another rule, Title 8 C.F.R. § 242.54(b), which provides that:
 
 
 18
 "The special inquiry officer may enter of record any statement, oral or written, which is material and relevant to any issue in the case, previously made by the respondent or any other person during any investigation, examination, or hearing."
 
 
 19
 Under this rule the prior written statements of relator signed and sworn to by him were admissible.
 
 
 20
 The relator also insists that the immigration authorities were required to prove that he was an alien before a valid order for his deportation could be made and that they failed to sustain this burden of proof which the law placed upon them. This contention cannot be sustained. Granted that alienage must be proved, the evidence here was more than sufficient. The evidence included the sworn statements of the relator in various official documents which we have discussed above. In addition to these sworn documents showing his alienage, the relator was present at the hearing and on the advice of counsel refused to testify on the question, and no other evidence was presented by him to controvert the evidence which was presented by the Government on this question. It must be remembered that this was not a criminal case where the failure of the defendant to testify could not be considered against him. This was a civil proceeding and the relator's failure to testify and to deny the charge that he was an alien corroborated the Government's evidence. In Bilokumsky v. Tod, 263 U.S. 149, 154, 44 S.Ct. 54, 56, 68 L.Ed. 221, the Supreme Court held that: "Since alienage is not an element of the crime of sedition, testifying concerning his status could not have had a tendency to incriminate him. There was strong reason why he should have asserted citizenship, if there was any basis in fact for such a contention. Under these circumstances his failure to claim that he was a citizen and his refusal to testify on this subject had a tendency to prove that he was an alien." In Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549, the Supreme Court again held that where the alien in a deportation case had refused, on advice of counsel, to testify on a certain point there could be an inference that his testimony if given would be against him.
 
 
 21
 The relator also insists that the evidence fails to show that he did not become a citizen through the naturalization of his father. Exhibit 15 was an affidavit by the relator to the effect that his father had at one time told the relator that he, the father, had been naturalized and that the relator was thereby made a citizen. The affidavit also discloses, however, that after the father's death the relator looked through his effects and found no such record. Relator then wrote to New York to see if there was a naturalization record for his father but none could be found. On this question the Government introduced Exhibit 20 which was a certificate made by the Chief of the Information, Mail and Files Section of the Immigration and Naturalization Service that the Service was unable to find any record of the father's naturalization. All of this certainly made a prima facie case for the Service. In the absence of any evidence to the contrary nothing more was required.
 
 
 22
 The relator insists that the order for his deportation was erroneous and contrary to law because it overlooked "the obvious fact that Congress in enacting Sec. 241(a) (4) of the Immigration and Nationality Act of 1952 did not and could not possibly intend to apply the same to minors." To sustain this contention the relator points out that at the time he was convicted of his first crime in 1916 he was only eighteen years of age and that the 1952 Act provides, Section 212(a) (9) [8 U.S.C.A. § 1182(a) (9)], that an alien who has committed only one crime while under the age of eighteen years may under certain conditions be granted a visa and permitted to enter this country. This provision has no application to relator and furnishes no reason for his not being deported under the clearly applicable provisions of either the 1952 Act or the 1917 Act. If the Congress had intended that aliens who had committed crimes when they were minors should be treated differently as to deportation these Acts would have so provided.
 
 
 23
 The relator also contends that the Immigration Department, because of its long delay in instituting deportation proceedings, is now estopped from deporting the relator. There is no merit in this contention. The Congress, of course, could have provided a period of limitations within which time deportation proceedings must be brought, but this was not done as to either of the grounds on which the relator was ordered deported. In the absence of such a statutory provision the mere failure of the officers of the Immigration Service to act sooner in this deportation proceeding could not be held to estop them from acting. 19 Am.Jur., pages 818, 819. Another complete answer to this claim by the relator is found in the fact that in some of the documents he filed with the Service he concealed some of the facts which authorized his deportation. Such concealment of the true facts also precludes his resorting to the equitable ground of estoppel.
 
 
 24
 The relator's final contention is that the Immigration and Nationality Act of 1952 is unconstitutional. He contends that this Act as well as the 1917 Act is unconstitutional because the use of the phrase "involving moral turpitude" to describe the type of crimes the commission of which is to make an alien subject to deportation makes the law "void for vagueness." The Supreme Court decided this question against the relator in Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886. The Court there said, 341 U.S. at pages 231-232, 71 S.Ct. at page 708, that the descriptive phrase, "involving moral turpitude," conveys "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."
 
 
 25
 The administration of the Act by the Immigration Service is not, as relator contends, an unconstitutional delegation of power. In Carlson v. Landon, 342 U.S. 524, 537, 72 S.Ct. 525, 532, 96 L.Ed. 547, the Supreme Court said: "The power to expel aliens, being essentially a power of the political branches of government, the legislative and executive, may be exercised entirely through executive officers, `with such opportunity for judicial review of their action as congress may see fit to authorize or permit.'"
 
 
 26
 The relator also contends that both the 1917 Act and the 1952 Act, as they have been applied to him, are unconstitutional because, as to him, they are ex post facto in that his deportation under these Acts is based upon crimes which he committed before their enactment. This question has long since been decided against the contention of the relator. Since deportation statutes are not criminal they cannot be ex post facto. "There is no question as to the power of Congress to enact a statute to deport aliens because of past misconduct. Mahler v. Eby, 264 U.S. 32, [44 S.Ct. 283, 68 L.Ed. 549]; Ng Fung Ho v. White, 259 U.S. 276, 280, [42 S.Ct. 492, 493, 66 L. Ed. 938]; Bugajewitz v. Adams, 228 U.S. 585, [33 S.Ct. 607, 57 L.Ed. 978]; Fong Yue Ting v. United States, 149 U.S. 698, 730, [13 S.Ct. 1016, 1028, 37 L.Ed. 905]." United States ex rel. Eichenlaub v. Shaughnessy, 338 U.S. 521, 529, 70 S.Ct. 329, 333, 94 L.Ed. 307. The fact that actions to deport are not criminal and that the Supreme Court has said that deportation, therefore, does not constitute punishment also answers the relator's contention that his deportation would constitute "cruel and unusual punishment."
 
 
 27
 In speaking of the Alien Registration Act of 1940 the Supreme Court recently said in Harisiades v. Shaughnessy, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586: "However, even if the Act were found to be retroactive, to strike it down would require us to overrule the construction of the ex post facto provision which has been followed by this Court from earliest times. It always has been considered that that which it forbids is penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment. Deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure. Both of these doctrines as original proposals might be debatable, but both have been considered closed for many years and a body of statute and decisional law has been built upon them."
 
 
 28
 The relator also contends that since these Acts apply to aliens retroactively they do not treat all aliens alike. Those convicted after their enactment may petition the court in which they were convicted for a recommendation of the court against their deportation. 8 U.S.C.A. § 155(a) (1942 Edition) and 8 U.S.C.A. § 1251(b). If the court makes such a recommendation it is mandatory upon the Attorney General. United States ex rel. Santarelli v. Hughes, 3 Cir., 116 F.2d 613. Of course. aliens convicted before the passage of these Acts had no opportunity to apply for such recommendations. The relator says that by reason of this fact he had been denied "due process" under the Fifth Amendment. In Fong Yue Ting v. United States, 149 U.S. 698, 707, 13 S.Ct. 1016, 1119, 37 L.Ed. 905, the Supreme Court said: "The right of a nation to expel or deport foreigners who have not been naturalized * * * rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country." And in Mahler v. Eby, 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549, the Court said: "The right to expel aliens is a sovereign power, necessary to the safety of the country, and only limited by treaty obligations in respect thereto entered into with other governments."
 
 
 29
 During the pendency of this appeal Walter A. Sahli succeeded Marcus T. Neelly as District Director of Immigration and Naturalization and on his motion he was substituted as respondent-appellee in this appeal.
 
 The judgment of the District Court is
 
 30
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Now 18 U.S.C.A. § 1951