MATTER OF M—

In DEPORTATION Proceedings

A-11875663

*Decided by Board August 2, 1961*

**Expatriation—Section 349(a)(3), 1952 act—Volunntary service in Rebel Army of Cuba after January 1, 1959.**

(1) Native-born United States citizen who served in the Rebel Army of Cuba subsequent to January 1, 1959, is held to have expatriated under the provisions of section 349(a)(3) of the Act upon evidence establishing that he voluntarily joined the rebel forces in Cuba in January 1958, that he went back to the United States in December 1958, and that he voluntarily returned to Cuba in January 1959 and resumed his military rank (Captain) and duties without protest.

(2) Service in the Rebel Army of Cuba after January 1, 1959, the date on which Castro came to power, constitutes service in the armed forces of a foreign state as defined in section 349(a)(3) of the Act.

CHARGES:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—No immigrant visa.

Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Convicted of crime involving moral turpitude, to wit, carnal knowledge and abuse.

## BEFORE THE BOARD

**DISCUSSION:** The case comes forward on appeal from the order of the special inquiry officer dated May 31, 1961, finding the respondent to be an alien and directing his deportation on the charges contained in the order to show cause.

The respondent was born in Milwaukee, Wisconsin, on August 1, 1921, last entered the United States at the port of El Paso, Texas, on or about July 22, 1960, and was admitted upon his claim that he was a citizen of the United States. The respondent was, of course, a citizen of the United States at birth.[1] The primary question to be resolved is whether the respondent, as result of conduct subsequent to his birth, expatriated himself under the provisions of section 349(a)(3) of the Immigration and Nationality Act (8 U.S.C.

---

[1] U.S. Constitution, Fourteenth Amendment, and section 1992, U.S. Revised Statutes.

1481(a)(3)), which provides for loss of nationality by a native or naturalized citizen after the effective date of the Act by:

entering, or serving in, the armed forces of a foreign state unless, prior to such entry or service, such entry or service is specifically authorized in writing by the Secretary of State and the Secretary of Defense * * *.

It has been established that the respondent was a citizen of the United States at birth. The Government, therefore, has the burden of proving that the respondent subsequently became expatriated. The burden is a heavy one; the proof to establish loss of citizenship must be clear, unequivocal and convincing.[2] Likewise, the burden is upon the Government to establish that the expatriatory act was performed voluntarily.[3] The contentions raised by brief and oral argument on the issue of alienage raise the following questions:

(1) Did the respondent serve voluntarily in the Rebel Army of Cuba after January 2, 1959?

(2) Did service in the Rebel Army of Cuba constitute service in the armed forces of a foreign state within the meaning of section 349(a)(3)?

The record establishes that respondent went to Cuba in January 1958 to join the revolutionary forces of Castro against the existing Batista regime. The motivation which prompted the respondent to join the Castro regime does not appear to us to be material. Starting as a private he rose to rank of Captain in July 1958. He testified that he returned to the United States in November or December 1958 for medical treatment. However, after Batista had been deposed, and the respondent knew the actual fighting had ceased, the respondent returned to Havana about January 5, 1959, allegedly for a reunion with comrades, in arms with whom he had fought during the revolution. There is some inconsistency in the testimony of the respondent regarding his own thoughts as to his status upon his return to Cuba, but it is established by the record that respondent returned to one of the leaders of the revolutionary forces in whose home he slept in La Cabana, a military fortress in Havana, and who, on the next day, took him to general quarters and assigned him to take over the corps of guards and the security of the Rebel Army at La Cabana, with the rank of Captain, supervising the guards at the tribunals of the revolutionary forces in executing the orders of the tribunals. He remained at La Cabana until May 1959, when the executions of persons condemned to death by the revolutionary tribunals ceased, and acknowledged that during that

---

[2] *Nishikawa* v. *Dulles*, 356 U.S. 129; *Gonzales* v. *Landon*, 350 U.S. 920; *Baumgartner* v. *United States*, 322 U.S. 665; *Schneiderman* v. *United States*, 320 U.S. 118.

[3] *Nishikawa* v. *Dulles*, *supra*; *Perez* v. *Brownell*, 356 U.S. 44; *Matter of G—*, 8—317.

period he was a member of the Rebel Army and the men under his command were likewise members. About June 1959 he was transferred to various installations, men under him performing chiefly guard duty, although for one month during July 1959 gave instructions in the use of weapons at a military police school and again at Principe Prison, Havana, from March 1960 until he left Cuba in May 1960.

It has been established that during the period of his service the respondent retained his military rank of Captain, wore the insignia, issued commands to men under his jurisdiction and was himself subject to official orders of his commanding officer or chief of staff, and was paid by the Chief of Staff of the Rebel Army. He was holder of an identity card issued by the Director of Personnel of the Rebel Army on August 17, 1959, identifying him as a Captain of the Rebel Army. Several witnesses testified to the effect that the respondent wore a uniform, olive-green in color, and that the men under his command in the firing squad wore the same uniform without the insignia of Captain (three chevrons) which the respondent wore. He vouched for the truth and correctness of a magazine article covering his military activities subsequent to January 1959.

Although the respondent has claimed that his service in the Cuban army after January 1959 was involuntary, it is to be remembered that the respondent's original act of joining the Cuban revolutionary forces was voluntary and that he was in the United States at the time the Batista regime was overthrown and the actual fighting had ceased. There is no showing that his return to Cuba in January 1959 was other than voluntary, for it is manifest that he could have remained in the United States without fear of punishment or retribution from the Rebel Army of Cuba. There is some indication that the respondent's return to Cuba in January 1959 was motivated by the prospect of sharing in the land distribution of the agrarian reform program promised by Castro. However, when he returned, it does not appear that he was impressed into service or compelled to return to service. The respondent, it is to be remembered, was a volunteer foreigner and his case differs from those persons who were conscripted into service.[4] On the other hand, he sought out his commander, was cordially received, and was continued in the rank of Captain with complete willingness and without any protest either to the commanding officer or to the American Consul. After voluntarily returning to Cuba and continuing in his military rank and duties since January 1959 without protest, his present claim of duress does not appear credible. Having established his return to military service in the Rebel Army

---

[4] *Nishikawa* v. *Dulles*, 356 U.S. 129 (1958) ; *Podea* v. *Acheson*, 179 F.2d 306 (C.A. 2, 1950).

in January 1959 was voluntary and of respondent's own free will, a discussion as to respondent's difficulty in thereafter obtaining his release from military service would appear to be academic. It is believed that the evidence establishes conclusively the voluntariness of the respondent's service in the Cuban revolutionary armed forces after January 6, 1959.

The next question to be resolved is whether the Rebel Army after the fall of the Batista regime subsequent to January 1, 1959, when Castro took over the reins of the Cuban Government, constituted the armed forces of a foreign state within the meaning of section 349(a)(3) of the Immigration and Nationality Act. Prior to the fall of Batista and the then duly constituted Government of Cuba, it is not doubted that the Rebel Army was merely a revolutionary force and had no official or legal status. However, after January 1, 1959, Castro, by decree published in the *Official Gazette* of Cuba on January 2, 1959, was appointed the Commanding Chief of the Air, Sea and Land Forces of Cuba. Law #13 promulgated on January 13, 1959, temporarily suspended the Organic Law relating to the organization of what had previously constituted the regular Cuban Army, pending a reorganization of the armed forces. The fundamental law of Cuba setting up the organization and the new government became effective on February 7, 1959. Article 126 assigned to the President of the Republic, assisted by the Council of Ministers, the function of directing the Armed Forces of the Republic as their supreme head. Law #100 enacted February 23, 1959, created certain nonmilitary departments in the Rebel Army and assigned them to the Ministry of Defense. Law #600 of October 16, 1959, created a new Minister of Revolutionary Armed Forces (in lieu of the former Ministry of Defense) and placed all the armed forces of the country under its jurisdiction. This law dissolved the previously existing regular Cuban Army, Navy, National Police and Joint Chiefs of Staff and provided for the preparation of a new Organic Law within 60 days. However, the Rebel Army never disappeared but its continued existence as the armed forces of Cuba after Castro had taken over was explicitly recognized in Article 6 of Law #600 which stated that "members of the Rebel Arı and other persons at present rendering real and effective service in any of the Armed Forces of the Nation, shall retain their militaı status."

The Service produced a witness, Dr. J—A—M—, a former practicing attorney and public defender in Cuba, as an expert on Cuban law to testify as to the effect of these various provisions of law set out above. His qualifications were not disputed. This witness testified that although Law #13 temporarily suspended the Organic Law relating to the army, it did not dissolve the army itself nor

was Article 3 of Law #600 necessary to give the Rebel Army legal sanction; that law merely provided for the administrative organization of the Rebel Army and did not relate to the creation or existence of the Rebel Army as a military force of Cuba; and even without such a law, the Minister of the Revolutionary Armed Forces was empowered to issue decrees providing for the organization of the Rebel Army.

The Immigration and Nationality Act does not define the term "armed forces" as used in section 349(a)(3). The legislative history relating to loss of citizenship by serving in foreign military forces [5] comments that before enactment of the Nationality Act, entry into or service in the armed forces of a foreign state would not, of itself, cause loss of citizenship but that under the Nationality Act loss of citizenship occurred under certain circumstances, such as the possession or acquisition of the nationality of the state for which he was serving. The report referred to the modification of the general rule of expatriation by entering foreign service by certain Executive Agreements which permitted foreign service without expatriation. It also made reference to the holding that service in the reserve forces in a foreign state would expatriate if the obligations thereby incurred were the same as those in active service if nationality of the foreign state was acquired. The Subcommittee commented that the provisions covering loss of nationality through service in the armed forces of a foreign country should be uniform and should not be dependent upon foreign law, and was therefore recommending changes in the subsection relating to expatriation by service in foreign military forces. In the report to accompany S. 2550, which became the Immigration and Nationality Act,[6] in connection with the provision of the Nationality Act of 1940 which caused loss of nationality by entering or serving in the armed forces of a foreign state unless expressly authorized to do so by the laws of the United States, the report pointed out that the new bill requires, in lieu of general authorization, that a specific authorization in writing must be made by the Secretary of State and the Secretary of Defense before a national of the United States may enter or serve in the armed forces of a foreign state without losing his status as a national of the United States. The legislative history, therefore, discloses an intent on the part of Congress to broaden the expatriatory consequences of service in the armed forces of a foreign state.

There is no doubt in the testimony of witnesses and from reference to the various Cuban laws, previously referred to, that after Castro came into power in January 1959 the Rebel Army constituted the only effective military establishment in Cuba, that it was, *de facto*,

---

[5] Senate Report No. 1515 (81st Cong., 2d Sess., p. 749).
[6] Senate Report No. 1137 (82d Cong., 2d Sess., p. 46).

the exclusive armed force prior to the passage of laws which directed the absorption of the remnants of the former Cuban army in a subordinate or subservient role until the final dissolution of the former regular army in October 1959. We agree with the conclusion of the special inquiry officer that the assignment of certain nonmilitary duties to the Rebel Army did not negate its status as a military force. Cases cited by counsel limiting the term "armed forces" under prior law are distinguishable since they involve reserve or training units rather than active military components, and there is no dispute that respondent was actually serving in the active part of the Cuban military armed force. The unreported *Matter of F—A—F—*, A-11884065, cited by counsel, in which proceedings were terminated by the special inquiry officer on May 14, 1961, is not a binding precedent and the issue there appeared to be whether that respondent was an officer of the Rebel Army after January 1959. In this case, the testimony of the respondent and of witnesses clearly demonstrates that respondent served voluntarily in active service in the armed forces of a foreign state. Voluntary foreign military service having been proved, the element of intent as a factor in expatriation is not critical.[7] Expatriation of the respondent pursuant to section 349(a)(3) of the Immigration and Nationality Act has been established by clear, convincing and unequivocal evidence.

Alienage having been established, consideration of the deportability of this respondent on the charges set forth in the order to show cause is in order. At the time of his last entry the respondent intended to remain in the United States indefinitely although not in possession of an immigrant visa or any document in lieu thereof. It is the performance of expatriatory acts which results in loss of nationality, not the time of the adjudication thereof.[8] The respondent has admitted that he was put on notice as to the effect of his conduct by the service of a certificate of loss of nationality upon him by the consular officer at Havana. True, such certificate is not conclusive on the issue of loss of nationality, but the respondent cannot now plead ignorance or surprise and should have resorted to established procedures for seeking a final determination on the issue of loss of nationality. Although the respondent testified that he was in contact with the American Consul in Havana, there is no indication that he sought to avail himself of the procedure set forth in sections 360(a) and (c) of the Immigration and Nationality Act for a determination of his citizenship status. The case appears to be distinguishable from the cases of naturalized citizens who subsequently were denaturalized and to whom the relation back doctrine as to

---

7 *MacKenzie* v. *Hare*, 239 U.S. 299; *Savorgnan* v. *United States*, 338 U.S. 491; *Perez* v. *Brownell*, 356 U.S. 44.

8 Section 356 of the Immigration and Nationality Act.

documentary requirements has been held inapplicable.[9] The first charge in the order to show cause is sustained.

The record establishes that the respondent was convicted on November 14, 1951, on his plea of guilt in the Municipal Court, City of Milwaukee, Wisconsin, of the offense of carnal knowledge and abuse of a female, 16 years of age, contrary to section 340.47 of the statutes and was sentenced on January 11, 1952, to an indeterminate sentence of one to four years. Section 340.47, Wisconsin Statutes, provides: "Any person over eighteen years of age who shall unlawfully and carnally know and abuse any female under the age of eighteen years shall be punished by imprisonment in the State Prison for not more than 35 years nor less than one year; or by a fine not exceeding $200 * * *." This crime has been likened to statutory rape and involves moral turpitude.[10]

Counsel does not dispute that respondent has been convicted of a crime involving moral turpitude. However, counsel contends that respondent was not a member of an excludable class at the time of his last entry by virtue of such conviction because section 212(a)(9) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(9)) applies to "aliens" who have been convicted of such a crime and the respondent's conviction occurred in 1952 when he was a citizen of the United States and prior to the occurrence of any of the allegedly expatriating acts. The same contention was raised in *Matter of S—*, 5—678, and was rejected, it being held that the respondent's conviction of crime involving moral turpitude was precedent to his excludability and the adjudication of his status as an alien was a necessary further condition to the requirements of the Immigration and Nationality Act.[11]

Counsel has raised constitutional objections to the provisions of section 349(a)(3) upon the record, but recognizes that such constitutional objections cannot be entertained at the administrative level. We have read the record and believe that respondent was accorded a fair hearing and due process and that the special inquiry officer permitted counsel for the respondent wide leeway in raising objections and expressing himself upon the record. We see no evidence of prejudgment upon the part of the special inquiry officer. We

[9] *Matter of W—*, 5—759. The holding in the case of *Podea* v. *Acheson*, 179 F.2d 306, cited by counsel, was that the plaintiff's military service was under duress and did not result in expatriation.

[10] *Pino* v. *Nicolls*, 215 F.2d 237, rev. on other grounds, 349 U.S. 901; *Bendel* v. *Nagle*, 17 F.2d 719; *Matter of R—*, 3—562.

[11] Reliance was placed upon *United States ex rel. Eichenlaub* v. *Shaughnessy*, 338 U.S. 521, and the decision in *Mangaoang* v. *Boyd*, 205 F.2d 533, cert. den. 346 U.S. 876, was held to be not controlling for the reasons set forth on page 555 of that decision; see also *Matter of B—*, 5—405, footnote 4.

are not prepared to disturb the finding of the special inquiry officer who had an opportunity to observe the demeanor and deportment of the respondent and the witnesses on the issue of credibility. After a careful consideration of the record, we concur with the finding of the special inquiry officer as to alienage and deportability.

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.