**UNITED STATES of America, ex rel. Dominic SCIRIA, Relator,**

v.

**John H. LEHMANN, Officer in Charge, U. S. Immigration and Naturalization Service, Respondent.**

Civ. A. No. 31731.

United States District Court
N. D. Ohio, E. D.

Oct. 7, 1955.

Henry C. Lavine, Cleveland, Ohio, for plaintiff.

Sumner Canary, U. S. Atty., Cleveland, Ohio, for defendant.

McNAMEE, District Judge.

The petitioner, Dominic Sciria, an alien who has been ordered deported, challenges the legality of the order of deportation in his petition for writ of habeas corpus.

The issue presented is whether the status of non-deportability that the petitioner enjoyed prior to the effective date of the Immigration and Naturalization Law of 1952, 8 U.S.C.A. § 1101 et seq., is preserved to him by the savings clause of that Act, 8 U.S.C.A. § 1101 note.

There is no dispute as to the facts. Petitioner, a native of Italy, entered the United States as a stowaway on or about July 28, 1922. He has resided continuously in this country since that time. He is now 56 years of age, is married to a native-born citizen, and has two sons. One of his sons had just completed service in the United States Army at the time the deportation proceeding was commenced, and the other is still serving in the armed forces of this country. In 1928 petitioner was convicted of the charge of illegally transporting intoxicating liquor in violation of the laws of West Virginia and sentenced to serve a term of ten months imprisonment. In 1942 he was convicted in the Common Pleas Court of Cuyahoga County, Ohio of the crime of blackmail, for which he served slightly more than one year's imprisonment. His criminal record furnishes no ground for deportation. His expulsion from this country is sought and was ordered solely upon the grounds alleged in the Warrant of Deportation, which are:

That the petitioner is subject to deportation under

"Sec. 241(a) (1) of the Immigration and Nationality Act, in that, at time of entry he was within one or more of the classes of aliens excludable by the law existing at the time of such entry, to wit, a stowaway, under Sec. 3 of the Act of Feb. 5, 1917 and a person who has not presented an unexpired passport or official document in the nature of a passport issued by the government of the country to which he owes allegiance or other travel document showing his origin and identity, as required by the Passport Act of May 22, 1918 and the

Executive Order in effect at the time of entry."

The Immigration and Naturalization Act of 1917, Title 8 U.S.C. § 155, 39 Stat. 889, which was in effect at the time of the petitioner's entry in 1922, provided:

"At any time *within five years after entry*, any alien who at the time of entry was a member of one or more of the classes excluded by law * * * shall be deported".

(Emphasis supplied.)

Stowaways were included within the classes excluded by the 1917 Act.

The Passport Act of 1918, 40 Stat. 559, referred to in the Warrant was an emergency war measure which, together with the Presidential Proclamation issued pursuant thereto, prohibited *inter alia* the departure from or entry into the United States during the period of World War I of aliens except upon compliance with the conditions contained in the Presidential Proclamation. By the Act of July 2, 1921, 42 Stat. 105, Congress declared the war with Germany at an end. However, by the Act of March 2, 1921, 41 Stat. 1217, 22 U.S.C.A. § 227, the provisions of the Act of May 22, 1918, so far as they related to requiring passports from aliens seeking to enter the United States, were continued in effect until otherwise provided by law.

In United States ex rel. Costea v. Smith, D.C., 36 F.2d 503, it was held that the Passport Act of May 22, 1918 and its extension Act of March 2, 1921, did not authorize deportation of an alien because he entered without a passport bearing visa of an American Consul. In this connection the court said:

"So much of the act as was extended to peace times does not carry, as one of the consequences of its violation, the deportation of an alien. The act and the proclamation contain provisions relating to passports and visas which are intended for the guidance of immigration officials. Neither the act nor the proc-

lamation contain any mandate authorizing deportation."

While the Seventh Circuit Court of Appeals reversed the decision in Costea on other grounds, it expressly approved the reasoning and conclusion of the district judge as noted above. Feil v. Smith, 46 F.2d 229, at page 230. Under the holdings in Costea petitioner would not be deportable at any time after entry on the ground that he entered this country without a passport. While the opinions in that case are entitled to great respect, I am not disposed to follow them. It is true that the Passport Act of 1918 and its extension Act of 1921 did not provide for the deportation of aliens entering this country without a passport. However, that Act did provide for the exclusion of such aliens, thus bringing them within the terms of the 1917 Act which expressly authorized the deportation of "any alien who at the time of entry was a member of one or more of the classes excluded by law." See United States ex rel. Vajta v. Watkins, 2 Cir., 179 F.2d 137. The five-year limitation on deportation applied in all such cases, and inasmuch as no attempt was made within five years after his entry to deport the petitioner on either of the grounds stated in the warrant, he was not subject to deportation thereafter under the law in effect prior to 1952.

The Immigration Act of 1924, 43 Stat. 153, 8 U.S.C. § 201 et seq., limited the immigration of aliens into the United States and provided for the deportation of aliens who entered this country without an immigrant visa, but specified no limitation of time within which such deportation proceedings must be commenced. However, the 1924 Act did not repeal the five-year limitation in the Act of 1917, and this latter provision remained in effect until 1952. Thus, prior to the enactment of the 1952 Act an excluded alien who entered the United States prior to July 1, 1924 could not be deported on that ground unless proceedings to accomplish this result were commenced within five years after his entry. The five-year limitation also ap-

plied to the deportation of excluded aliens who entered the United States after July 1, 1924; but excluded aliens who entered this country after July 1, 1924 without immigrant visas also violated the Act of 1924 and could be deported on that ground at any time. Ali v. Haff, 9 Cir., 114 F.2d 369; Kunimori Ohara v. Berkshire, 9 Cir., 76 F.2d 204; Bhagat Singh v. McGrath, 9 Cir., 104 F.2d 122. Having entered this country as a member of excluded classes prior to July 1, 1924, to wit, on July 28, 1922, petitioner acquired a status of non-deportability on July 28, 1927 which continued to the effective date of the 1952 Act.

The Government was aware of the presence in this country of aliens who were not subject to deportation because of their entry prior to July 1, 1924. Late in the year 1927 the Government sought to deport this petitioner, but dismissed the proceeding against him because it had been commenced subsequent to five years after his entry. Thus it appears that for a quarter of a century in the case of petitioner, and presumably for longer periods of time in the case of other aliens in the same class, Congress acquiesced in their continued residence in this country with full knowledge that under the law then in effect such aliens were not subject to deportation. That such acquiescence was no mere fortuity is evidenced by the privilege conferred upon aliens who entered the United States prior to July 1, 1924, by other provisions of law.

The Act of March 2, 1929, 45 Stat. 1512, as amended by the Act of August 7, 1939, 53 Stat. 1243 (see Section 728 (b) Title 8 U.S.C.), authorized the Attorney General to make a record of lawful admission for permanent residence in the case of "any alien" who entered the United States prior to July 1, 1924 for whom no such record was available. By the terms of former Section 728(b) an alien who entered before July 1, 1924, applying for such a record, was required to show in addition that he had resided here continuously since such entry—was

a person of good moral character—not ineligible to citizenship—and not subject to deportation. The section further provided that if such record be made the alien "shall be deemed to have been lawfully admitted to the United States for permanent residence as of the date of such alien's entry." The provisions of former Section 728(b) were probably designed primarily for the benefit of aliens who lawfully entered this country prior to July 1, 1924 and of whose admission there was no available record. However, under the broad designation of "any alien" whose entry was before that date the section was applicable as well to aliens who entered the United States unlawfully but who were in all other respects qualified to apply for the benefits of the section. See Linklater v. Perkins, 64 App.D.C. 69, 74 F.2d 473. Section 728(b) was reenacted in the Act of 1952 where it appears as Section 1259. There are a few slight changes in phraseology and arrangement of the text in the new section, but in scope and effect it is identical with former Section 728(b). It would seem, therefore, that Congress has adhered consistently to a policy of permitting aliens who unlawfully entered the United States prior to July 1, 1924 to apply for a status of permanent residence in this country. Kansas, in his work entitled "Immigration and Nationality Act, Annotated," has this to say of the effect of former Section 728 (b) and Section 1259 of Title 8 U.S.C.A.:

> "However, if he (the alien) entered prior to July 1, 1924 and has not departed since, he cannot be deported for illegal entry alone. (Act of March 2, 1929, as amended August 7, 1939.) Carried over into the Act of 1952." P. 123.

See also Commentary on Immigration and Nationality Act of 1952 by Walter M. Besterman, pp. 65, 66, Vol. 1, Title 8 U.S.C.A.

The Government contends that petitioner was divested of his status of non-deportability under prior law by the repeal of the 1917 Act and by the provisions of Sections 1251(a) (1) and 1251 (d) of the Act of 1952.

It is no longer open to question that Congress in the exercise of its plenary power over aliens may enact legislation retroactive in its effect and provide for the expulsion of aliens on grounds that were non-existent at the time of their entry and remove existing bars to deportation. Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547; Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586; United States ex rel. Eichenlaub v. Shaughnessy, 338 U.S. 521, 70 S.Ct. 329, 94 L.Ed. 307; Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549; Marcello v. Ahrens, 5 Cir., 212 F.2d 830.

The only question that arises in this connection is whether by the terms of the pertinent provisions of the 1952 Act, Congress expressed its intention to deport aliens who had acquired a status of non-deportability under prior law.

Section 1251(a) (1) of the Act of 1952 provides:

> "(a) Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

> "(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry; * * *."

Section 1251(d) provides in part as follows:

> "(d) Except as otherwise specifically provided in this section, the provisions of this section shall be applicable to all aliens belonging to any of the classes enumerated in subsection (a) of this section, notwithstanding (1) that any such alien entered the United States prior to June 27, 1952, * * *."

The foregoing sections of the 1952 Act must be read together with the savings clause, which in pertinent part provides:

> " 'Nothing contained in this Act, unless otherwise specifically provid-

ed therein, shall be construed to affect * * * any prosecution, suit, action, or proceedings, civil or criminal, brought, or any status, condition, right in process of acquisition, act, thing, liability, obligation, or matter, civil or criminal, done or existing, at the time this Act shall take effect; but as to all such prosecutions, suits, actions, proceedings, statutes [should probably read *statuses*], *conditions*, rights, acts, things, liabilities, obligations, **or** matters the statutes or parts of statutes repealed by this Act are, unless otherwise specifically provided therein, hereby continued in force and effect.'" (Emphasis supplied.) 8 U.S.C.A. § 1101 note.

While Sections 1251(a) (1) and 1251 (d) expressly provide for the deportation of any alien who was excludable by the law in effect at the time of entry, even though such entry occurred before June 27, 1952, these sections do not specifically provide for the deportation of aliens who were excludable under the law in effect at the time of entry but who acquired a status of non-deportability thereafter under prior law. Nor is there any specific provision for the deportation of aliens who illegally entered this country as members of an excluded class prior to July 1, 1924. If Section 1251(a) (1) be given the effect claimed for it by the Government, then "any alien" within the classes designated by that section would include—(a) excluded aliens who were eligible to apply for permanent residence under former Section 728(b) and who are still eligible to apply for such status under Section 1259 of the Act of 1952, and (b) excludable aliens who have been granted discretionary relief in deportation proceedings under former Section 155 Title 8 U.S.C. The construction for which the Government contends would also produce an anomaly in the case of aliens who had been admitted to permanent residence in the United States under former Section 728 (b). While such aliens would be deemed to have been lawfully admitted into this country as of the time of their entry, they would nevertheless be aliens who, within the terms of Section 1251(a) (1) were excludable at the time of entry by the law then in effect. It is unreasonable to suppose that Congress would reverse its long-standing policy towards excludable aliens who entered this country prior to July 1, 1924 otherwise than by a plain and specific declaration of its purpose to do so. Section 1251(a) (1) cannot be construed as expressing such intention. That section is applicable generally to all aliens within the classes therein defined. But it contains no specific provision at variance with the express terms of the savings clause. The savings clause provides that any statute or part of statute repealed by the 1952 Act shall continue in force and effect as to any "status" or "condition" existing at the time the 1952 Act became effective, except as otherwise specifically provided therein. As I read Section 1251 (a) (1) it does not specifically provide that the status of non-deportability acquired by aliens who entered the United States prior to 1924 shall be terminated. In the absence of such a specific provision in the 1952 Act, the savings clause is applicable and preserves to the petitioner his status of non-deportability. In United States v. Menasche, 348 U.S. 528, 75 S.Ct. 513, 518, the court reviewed extensively the history of the savings clause of the 1952 Act and its predecessors and concluded its comment thereon as follows:

"The whole development of this general savings clause, its predecessors accompanying each of the recent codifications in the field of immigration and naturalization, manifests a well-established congressional policy not to strip aliens of advantages gained under prior laws. The consistent broadening of the savings provision, particularly in its general terminology, indicates that this policy of preservation was intended to apply to matters both within and without the specific contemplation of Congress."

The Supreme Court's determination that it was the Congressional purpose, as expressed in the savings clause, "not to strip aliens of advantages gained under prior laws" and that the Congressional "policy of preservation was intended to apply to matters both within and without the specific contemplation of Congress", would seem to sustain, if not compel, the application of the savings clause to preserve the status quo as to the petitioner in this case. In Shomberg v. United States, 348 U.S. 540, 75 S.Ct. 509, 513, decided the same day as Menasche, the court held that by the use of "the 'notwithstanding' language in [Section 318] Congress clearly manifested its intent that certain policies should override the otherwise broad and pervasive principle of the savings clause." However, there is nothing in the opinion in Shomberg that weakens the force of the court's construction of the savings clause as stated in Menasche. In Shomberg the court made it clear that in the absence of a specific provision *to the contrary*, the rights of the petitioner in that case would be protected under the savings clause. 348 U.S. at page 543, 75 S.Ct. at page 511. In the recent cases of Ex parte Robles-Rubio, D.C., 119 F.Supp. 610, and United States ex rel. De Luca v. O'Rourke, 8 Cir., 213 F.2d 759, it was held that judicial recommendations under prior law which were effective to prevent the deportation of aliens convicted of illicit traffic in narcotics, continued to be valid under the savings clause of the 1952 Act notwithstanding the absence of any provision in that Act empowering judges to make recommendations against deportation in such cases. The same principle that governed in Robles-Rubio and De Luca would seem to be applicable here. The only essential difference between the cited cases and the case of petitioner relates to the manner in which the status of non-deportability was acquired. In Robles-Rubio and De Luca it was acquired by judicial recommendation—here petitioner's status is the result of legislative grace. But in both the cited cases and here there was a status that was preserved by the savings clause of the 1952 Act.

The decision here reached is sustainable upon yet another ground. The Supreme Court has indicated clearly its policy to construe doubtful language of a statute applicable in deportation proceedings most favorably to the alien where such language is reasonably susceptible of more than one interpretation. In Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 375, 92 L.Ed. 433, the court was required to construe the meaning of the words " 'sentenced more than once' ", as found in the Immigration Act of 1917. Under differing factual situations the Courts of Appeal of four circuits had variously construed this language. Although the deportation of the alien in that case was sought on the ground that he had been convicted of the murder of two persons, in separate counts of an indictment, and sentenced to life imprisonment, the Supreme Court adopted the construction most favorable to him. In assigning its reasons therefor the court said:

"We resolve the doubts in favor of that construction because deportation is a drastic measure and at times the equivalent of banishment or exile, Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10 [92 L.Ed. 17]. It is the forfeiture for misconduct of a residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used."

If it be assumed that Section 1251(a) (1) considered in relation to the savings clause is susceptible of a different interpretation than that adopted by this court,

it would seem, for the reasons stated in Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433, that the latter interpretation must nevertheless prevail.

Writ granted.