UNITED STATES of America, ex rel. Bruno CARSON or Bruno Carasaniti, Appellant,

v.

J. S. KERSHNER, Officer in Charge, Appellee.

No. 12361.

United States Court of Appeals Sixth Circuit.

Dec. 17, 1955.

Henry C. Lavine, Cleveland, Ohio, for appellant.

Eben H. Cockley, Asst. U. S. Atty., Cleveland, Ohio, Sumner Canary, Cleveland, Ohio, on brief, for appellee.

Before MARTIN, MILLER and STEWART, Circuit Judges.

STEWART, Circuit Judge.

A warrant of arrest in deportation proceedings was issued against the relator, Bruno Carson, in June of 1953. After a hearing before a Special Inquiry Officer of the Immigration and Naturalization Service he was ordered to be deported in the manner provided by law on the charges contained in the warrant of arrest. Following an unsuccessful appeal to the Board of Immigration Appeals he sought a writ of habeas corpus in the district court. He is here on an appeal from the district court's order denying the writ.

Carson is about fifty-four years old. He was born in Italy and entered the United States as a stowaway in 1919. Under the Immigration Act of February 5, 1917, then in effect, deportation proceedings could have been brought against him at any time within five years after his entry as a stowaway. No such proceedings were brought, and relator thereafter became immune from deportation on the stowaway charge under then existing law.[1]

In 1936 Carson was convicted in Ohio courts of two separate offenses of blackmail and was sentenced to a prison term of one to five years upon each conviction. After his release from prison in 1941 deportation proceedings were commenced against him under a warrant of arrest issued in 1937, based upon these two criminal convictions. In 1945 the outstanding order of deportation was withdrawn and the proceedings were terminated when the Governor of Ohio granted a conditional pardon for the sec-

1. Section 19 of the Immigration Act of February 5, 1917, 39 Stat. 874, 889, 8 U.S.C. (1934 Ed.) § 155, now 8 U.S.C.A. § 1251, provided: "At any time within five years after entry, any alien who at the time of entry was a member of one or more of the classes excluded by law * * *" shall be deported. Stowaways were among the classes excluded at the time of appellant's entry under Section 3 of the 1917 Act, 39 Stat. 876, 8 U.S.C. (1934 Ed.) § 136(*l*), now 8 U.S.C.A. § 1182(a) (18).

ond of his two convictions. This pardon was granted to Carson "From this time forward, conditioned upon good behavior and conduct and provided that he demeans himself as a law-abiding person and is not convicted of any other crime, otherwise this pardon to become null and void." It is conceded that the pardon granted to Carson was sufficient to confer immunity to deportation under the law then in effect.[2]

So far as the record shows, Carson has been a law-abiding person since his release from the penitentiary in 1941. He is married to a native born citizen and is the father of four native born children, two of them dependent minors. He is a carpenter and builder, earning about $6,000 a year.

The current deportation proceedings were initiated under the provisions of the Immigration and Nationality Act, effective December 24, 1952, 66 Stat. 163, 8 U.S.C.A. § 1101 et seq. They are based upon Carson's entry as a stowaway thirty-six years ago, and upon his two criminal convictions almost twenty years ago. Though conceding that Carson had acquired a status of nondeportability prior to the passage of the 1952 Act, appellee contends that Carson has now become deportable by virtue of the provisions of that statute.

The claim that Carson is deportable by reason of having entered as a stowaway is based upon Section 241(a) (1) of the 1952 Act, 66 Stat. 204, 8 U.S.C.A. § 1251(a) (1). That section provides: "Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry". As to Carson's deportability by reason of the two 1936 convictions despite his conditional pardon for one of them, appellee relies upon Section 241(a) (4) and Section 241(b) of

the 1952 Act, 8 U.S.C.A. § 1251(a) (4) and 8 U.S.C.A. § 1251(b). The first of these sections provides in part: "Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who— * * * (4) * * * at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct * * *." The second of the two sections provides in part: "The provisions of subsection (a) (4) of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply (1) in the case of any alien who has subsequent to such conviction been granted a full and *unconditional* pardon by * * * the Governor of any of the several States * * *." (Emphasis added.)

As to each of the grounds upon which the proposed deportation is based, appellee also calls our attention to Section 241 (d) of the 1952 Act, 8 U.S.C.A., § 1251 (d). That section provides: "Except as otherwise specifically provided in this section, the provisions of this section shall be applicable to all aliens belonging to any of the classes enumerated in subsection (a) of this section, notwithstanding (1) that any such alien entered the United States prior to June 27, 1952, or (2) that the facts, by reason of which any such alien belongs to any of the classes enumerated in subsection (a) of this section, occurred prior to June 27, 1952."

In the district court it was contended that since Carson was not deportable under the law as it existed prior to the effective date of the 1952 Act, that statute, insofar as it sought to make his previous conduct grounds for deportation, was an ex post facto law and therefore violative of Article I, Section 9, of the Constitution. In a brief memorandum incorporating the findings and reasoning of the Board of Immigration Appeals,

2. Section 19(a) of the Immigration Act of 1917, as amended, 54 Stat. 671, 8 U.S.C. (1946 Ed.) § 155(a), then in effect, provided: "The provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned * * *."

the district court rejected this contention and denied the writ.

■ In this respect the court's conclusion was entirely correct, and supported by unambiguous authority. "And whatever might have been said at an earlier date for applying the *ex post facto* Clause, it has been the unbroken rule of this Court that it has no application to deportation." Galvan v. Press, 1954, 347 U.S. 522, at page 531, 74 S.Ct. 737, at page 743, 98 L.Ed. 911. "That aliens remain vulnerable to expulsion after long residence is a practice that bristles with severities. But it is a weapon of defense and reprisal confirmed by international law as a power inherent in every sovereign state. Such is the traditional power of the Nation over the alien and we leave the law on the subject as we find it." Harisiades v. Shaughnessy, 1952, 342 U.S. 580, at pages 587–588, 72 S.Ct. 512, at page 518, 96 L.Ed. 586. "The interest which an alien has in continued residence in this country is protected only so far as Congress may choose to protect it; Congress may direct that all shall go back, or that some shall go back and some may stay; and it may distinguish between the two by such tests as it thinks appropriate." United States ex rel. Kaloudis v. Shaughnessy, 2 Cir., 1950, 180 F.2d 489, 490. So if the question here were one only of the power of Congress to deport Carson, the answer would seem clear that that power exists.

The unanswered question in this case, however, is not what Congress had the power to do, but what it did do. As to that, the above-cited statutory provisions, standing alone, would appear to give a clear answer, and require affirmance of the district court's order denying the writ of habeas corpus. But these provisions do not stand alone.

Section 405 of the 1952 Act, 8 U.S. C.A., § 1101 note contains a broad general savings clause. This clause provides in material part as follows:

"(a) Nothing contained in this Act, unless otherwise specifically provided therein, shall be construed to affect the validity of * * * any status, condition, right in process of acquisition, act, thing, liability, obligation, or matter, civil or criminal, done or existing, at the time this Act shall take effect; but as to all sueh * * * statutes [sic], conditions, rights, acts, things, liabilities, obligations, or matters the statutes or parts of statutes repealed by this Act are, unless otherwise specifically provided therein, hereby continued in force and effect. * * * "

This section therefore preserves Carson's status of nondeportability, "unless otherwise specifically provided" in the Act. It is appellee's contention that the Act does "otherwise specifically provide," in the above-cited sections upon which he relies. Relator insists that the quoted sections do not "otherwise specifically provide." Upon the resolution of that issue depends the disposition of this appeal.

The scope of the savings clause has recently been examined by the Supreme Court in two cases decided the same day, United States v. Menasche, 1955, 348 U.S. 528, 75 S.Ct. 513, and Shomberg v. United States, 1955, 348 U.S. 540, 75 S.Ct. 509. Though both cases involved the naturalization rather than the deportation provisions of the 1952 Act, the analysis the opinions make of the savings clause is significantly helpful in determining the questions at issue in the present case.

In the Menasche case it was held that the savings clause operated to protect the alien's previously acquired status. The Court traced the origin and development in our immigration and naturalization statutes of this savings provision. 348 U.S. 528, at pages 531–535, 75 S.Ct. 513, at pages 515–517. It was the Court's conclusion that "The whole development of this general savings clause, its predecessors accompanying each of the recent codifications in the field of immigration and naturalization, manifests a well-established congressional policy not to

strip aliens of advantages gained under prior laws. The consistent broadening of the savings provision, particularly in its general terminology, indicates that this policy of preservation was intended to apply to matters both within and without the specific contemplation of Congress." 348 U.S. at page 535, 75 S.Ct. at page 518.

In the Shomberg case the Court held that the savings provisions of section 405 of the Act did not preserve the alien's previously acquired status from the operation of section 318 of the Act. The Court found that the relevant savings clause in that case was the one contained in section 405(b). That section, like section 405(a), consists of a general savings provision which applies unless "otherwise specifically provided". Since section 318 expressly states that its provisions shall be applicable "notwithstanding the provisions of section 405(b) [of this Act,]" the Court concluded that here was an instance where the Act had "otherwise specifically provided" and where the savings clause therefore was superseded. In passing, the Court pointed out four other places in the 1952 Act where Congress had "clearly manifested its intent that certain policies should override the otherwise broad and pervasive principle of the savings clause." 348 U.S. at page 547, 75 S.Ct. 513; see footnote 5. In each instance cited the statute expressly states that a given provision shall apply "notwithstanding" the provisions of the savings clause.[3]

■ The Menasche and the Shomberg opinions thus clearly teach that the savings clause is to be interpreted as protecting status acquired under prior legislation, unless the intent to withdraw that protection is manifestly clear. It was held in the Shomberg case that such intent is clear where it is specifically provided that a provision shall be effective "notwithstanding" the terms of the savings clause. No such clear manifestation of intent is apparent in the present case.

■ We conclude that Carson's status of nondeportability is protected by section 405 of the Act, since the statutory provisions upon which appellee relies do not constitute such specific exceptions to section 405 as are contemplated in that section in order to make it inapplicable. In reaching this conclusion we have been aided by the reasoning of a recent decision directly in point by Judge McNamee of the Northern District of Ohio, in United States ex rel. Sciria v. Lehmann, D.C., 136 F.Supp. 458. In a characteristically clear and thorough opinion, Judge McNamee concluded that section 405(a) of the Act operated to protect the status of an alien entering as a stowaway in 1922 who had acquired immunity to deportation by the passage of time under the 1917 Act. It was Judge McNamee who denied the writ of habeas corpus in the present case. In the Sciria opinion he expressly stated his conclusion that he had been in error in the present case, pointing out that the savings clause had not been relied upon by Carson in the hearing before him. While Judge McNamee refrained from commenting upon the other ground for deportation relied upon in the present case, i. e., the fact that the pardon Carson received was not an unconditional one, the reasoning of his opinion in the Sciria case would also clearly lead to the conclusion we have reached that Carson's status of nondeportability on this ground is likewise preserved by section 405(a) of the Act.

Other federal courts have uniformly given a broad interpretation to section 405 in varying factual situations. See United States ex rel. De Luca v. O'Rourke, 8 Cir., 1954, 213 F.2d 759; Yanish v. Barber, 9 Cir., 1954, 211 F.2d 467;[4] Ex parte Robles-Rubio, D.C.N.D.

3. See also United States v. Stromberg, 227 F.2d 903.

4. "It would appear from the language of this reservation that Congress, as a measure of policy or precaution, intended to preserve the effectiveness of all subsisting proceedings, orders, or judgments fixing or determining individual statuses,

Cal.1954, 119 F.Supp. 610;[5] Yanish v. Barber, D.C.N.D.Cal.1955, 128 F.Supp. 240;[6] Petition of Pringle, D.C.E.D.Va. 1953, 122 F.Supp. 90, affirmed per curiam *sub nom.* United States v. Pringle, 4 Cir., 1954, 212 F.2d 878. On occasion, this uniformly broad interpretation has led to a result adverse to the alien. See United States v. Matles-Friedman, D.C. E.D.N.Y.1953, 115 F.Supp. 261; United States ex rel. Circella v. Neelly, D.C. N.D.Ill.1953, 115 F.Supp. 615, 625–626.

It should be pointed out that the argument advanced by the appellee would make the savings clause all but meaningless. The effect of his argument is that where there has been a specific *change* in the law relating to deportation, the savings clause has no application. Yet it is only when there has been such a change that the savings clause is of any moment at all. As pointed out in the Shomberg opinion, "Only where something in the new law introduces a change, thereby affecting one's status under the old law, is the savings clause called into play. Only then is a specific exception to § 405 required." 348 U.S. at page 546, 75 S.Ct. at page 512.

■ On the other hand, the conclusion we have reached does no violence to the provisions of section 241(d) of the Act, 8 U.S.C.A. § 1251(d), making the provisions as to deportability contained in section 241 applicable even though the alien entered the United States or that

the other facts which make him deportable occurred prior to the passage of the Act. It must be remembered that section 403 of the 1952 Act expressly repealed the predecessor statutes, among them specifically the 1917 and 1924 Acts.[7] The purpose and effect of section 241(d) is therefore to remove any doubt that the provisions of the Act as to deportation shall have retrospective as well as prospective application insofar as they are not superseded by the savings provisions of section 405. For example, we can assume without deciding that section 241(a) (1), 8 U.S.C.A. § 1251(a) (1), would serve to make an alien deportable who entered the United States as a stowaway subsequent to July 1, 1924.[8]

The Immigration and Nationality Act is lengthy and complex. If the interplay of its here relevant sections is not entirely free from doubt, the result we have reached is we think consistent with "our duty 'to give effect, if possible, to every clause and word of a statute' ". United States v. Menasche, 348 U.S. at pages 538–539, 75 S.Ct. at page 520. Moreover, if there be deemed to exist any reasonable doubt as to whether Congress intended to make an alien deportable, that doubt should be resolved in his favor. Fong Haw Tan v. Phelan, 1948, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433.

The order of the district court is set aside and the case is remanded for further proceedings consistent with the views expressed in this opinion.

obligations, liabilities, or rights; and for this purpose to have continued in force the statutes or parts thereof under which such status, obligation, liability or right became fixed or determined." 211 F.2d at page 470.

5. "The saving clause in the 1952 Act is one of unusual breadth as is appropriate in a statute which effects a complete revision of the immigration and nationality laws of the nation. The breadth of the savings clause is indicative of the Congressional awareness that the 1952 Act would inevitably have unforeseen effects upon preexisting statuses and conditions, and the Congressional desire to avoid such effects in so far as possible." 119 F.Supp. at page 613.

6. "It is difficult to imagine a more inclusive savings clause than the one just quoted." 128 F.Supp. at page 242.

7. 66 Stat. 279.

8. The Immigration Act of 1924, 8 U.S.C.A. § 201 et seq., effective July 1, 1924, did not contain a limitation period on deportability. Section 14 of the Immigration Act of 1924, 43 Stat. 162, 8 U.S.C. (1934 Ed.) § 214. Therefore, an alien entering as a stowaway after that date could acquire no immunity to deportation by the passage of time. Although that section has now been repealed by the 1952 Act, such a stowaway would presumably be deportable by reason of the cited sections of the 1952 Act.